Wardlaw, J.
delivered the opinion of the Court.
In support of the motion made in this case, it has been strongly urged that the whole slave code in this State is of legislative origin: that the offences for which slaves may be punished, capitally or otherwise, are defined or by reference to pre-existing law pointed out, in the negro Act of 1740 and subsequent Acts: that the misdemeanors of slaves, where no special legislation can be found, are only the same misdemeanors for which freemen are by law punishable: that the Act of 1831 (7 Stat. 468), which makes a misdemeanor in a slave of whatever in a freeman is a trespass for which a civil action lies, excludes the implication of any thing being a'misdemeanor in a slave which is not made so by any other Act of the Legislature, nor is such matter as would be a misdemeanor in a freeman, nor such as is provided for by this Act: and that therefore insolence by a slave towards a freeman (which is no where mentioned in any Act of the Legislature) is a private injury which might justify the beating of the slave by the person insulted, but is not a criminal offence for which punishment can be awarded by any Court. The question embraced in this conclusion, and which is presented in the-second ground of áppeal, is the only one to which the attention of this Court has been called: and to it only will attention be given.
The temporary Act of 1740, (7 Stat. 401) which, after various re-enactments for limited periods, was, subject to certain amendments, made perpetual by an Act of 1783, (4 Stat. 540) precis a tribunal for the trial of capital offences committed by *43 slaves, and a tribunal somewhat different for the trial of of-fences not capital committed by them; in the 15th, 16th and 17th sections it defines and specifies what shall be the capital offences of slaves, to the nurqber of which sohae addition is made by the amendatory Act of 1751 (7 Stat. 420): but neither the Act of 1740 nor any subsequent Act contains any enumeration of offences not capital in slaves, or any general description of them. In the Act of 1740, the only offence not capita] of a slave, which is mentioned and for which trial before a Court, and not summary punishment by a patrol or other white person, is provided, is the offence of striking a white person (sec. 24): and that seems to have been mentioned only to introduce the punishment of death for the second repetition of it. In this section and the other sections of the Act of 1740, and in the section before cited of the Act of 1831, the tribunal appointed to determine the punishment of offences not capital, is entrusted with a discretion which is limited only by the expression “not extending to life or limb,” and such (except the very few instances where a particular number of stripes had been prescribed by Act) continued to be the law until 1834, (6 Stat. 489) when it was enacted that “ in the conviction of a slave for any offence not capital, the punishment shall be by whipping, confinement in stocks, or tread-mill, and not otherwise,” — to which imprisonment was added in 1835.
A freeman would have a right to demand that the law should be pointed to, which provides for the punishment of the act for which he is to be tried, and to object that the erection of a new tribunal is not the creation of new offences* But a slave, can invoke neither magna charta nor common law. As is well said in Kinloch v. Harvey, Harp. 514, “ every endeavor to extend to him positive rights, is an attempt to reconcile inherent contradictions.” In the very nature of things, he is subject to despotism. Law as to him is only a compact between his rulers, and the questions which concern him are matters agitated between them. Our inquiry here, then, is not concerning the rights of the slave, but concerning the conflict between the rights of the master and the right set up by the Court to try the slave in opposition to the master’s will.
The various negro Acts, in the regulations concerning patrols, passes, runaways, insurrections, correction of slaves, striking by a slave, and similar subjects, contemplate throughout the subordination of the servile class to every free white’ person, and enforce the stem policy which the relation of master and slave necessarily requires. Any conduct of a *44 slave inconsistent with due subordination .contravenes the purpose of these Acts, and if not liable to punishment has either been overlooked by the legislator, or been thought, from some consideration of expediency, unfit for his notice. That language and deportment of a slave towards a white person,, which is inconsistent with the relation between them, and which we denominate insolence, cannot, however, be supposed, to have been overlooked, when the relation was fully recognized and rights given to the white which such language and deportment contradict. The prohibition of whatever is inconsistent with the relation established, is of course implied. But who shall judge of the inconsistency, and under what sanction is the prohibition? It has been urged that the silence of the legislator concerning insolence argues his sense of its undefinable nature and various shades, and thence of the expediency of leaving this matter to the master,, and of subjecting the prohibition of insolence, where really inconsistent with the relation between the slave and the white person, to the sanction only of the master’s displeasure. The fitness of the tribunal which is appointed to try the offences of slaves to judge of every case according to its circumstances, and the manifest evils which might result if the master’s will were absolute where third persons are aggrieved by the slave, seem, however, to oppose the notion that the legislator thought insolence unfit for his notice.
Accordingly we find, amongst our earliest reported cases, the case of White v. Chambers, 2 Bay, 70, decided in 1796; where, with the seeming approbation of the Court, it was argued that “the law had provided a remedy” for insolence, by application to the tribunal appointed to try the offences not capital of slaves, and that the punishment of it thus effected was of better example than for a freeman himself to chastise a slave for insolence to him. And although the point actually adjudged required no such observation, the three Judges, Burke, Grimke and Bay, are reported to have said that “ the best rule would be, in all cases where a slave behaved amiss or with rudeness or incivility to a free white person, to complain to the master or other person having the government of the slave, who, if actuated by courtesy, would give satisfaction: but if, upon such application, satisfaction was refused, then, upon an appeal to a civil magistrate, it was his duty to see that reparation was made according to the circumstances of the case.”
‘ In conformity with the law recognized in this case, trials of slaves for insolence have been, since 1796 (as without doubt they were before) frequent and unquestioned: so that inso- *45 fence, as an offence not capital in a slave, may be said, to exist by what Judge O’Neall, in the case of the State v. Crank, 2 Bail 75, calls “ the common law of this State.” The negro Act of 1690, (7 Stat. 341) and that of 1712, (7 Stat. 352) contain provisions with which the insolence of a slave is as plainly inconsistent as it is with the provisions of the Act of 1740, which re-enacted much that was in former Acts.' It may then well be supposed that the usage of trying and punishing slaves for insolence grew up under those earlier Acts: that the Act of 1740 has reference to such usage when it speaks of the offences not capital of slaves; and that this usage is part of the “ constitutions and customs of the province” inconsistent with the common law of England, which are excepted from the operation of the 5th section of the Act of 1712 (2 Stat. 413), which adopted that common law.
Decisions made upon other points, and legislation upon other subjects, seem to recognize insolence as a known of-fence, for which a slave may be punished by law.
The case of the State v. Crank, before cited, and the case of the State v. Cheatwood, (2 Hill, 461) distinguish between reasonable provocation by a freeman, which must be some battery or some assault, and reasonable provocation by a slave, which may be by insolent language or deportment : holding that upon an indictment for the murder of a slave, the latter may, according to circumstances, mitigate or excuse the killing.
An Act of 1841, p. 155, provides for the punishment of a white man “who shall unlawfully beat a slave not under his charge, without sufficient provocation by word or act” — showing that sufficient provocation by word or act of the slave would justify the beating. As the reasonable provocation by a freeman which would justify a -battery upon him is itself an indictable offence for which he may be punished, so the sufficient provocation by a slave which would justify the beating of him, is an offence which the law recognizes and punishes. The law usually permits self redress only from the necessity of the case, and prefers resort to it rather than private vengeance.
There is no case where, if the chance of redress be not lost by delay, the law will not quietly give the redress which it had permitted a person to take for himself. It cannot be intended that in various cases of insolence by slaves, the chol-erick man, if strong enough, shall take satisfaction with his own hand, but that the' quiet, the feeble, the woman, every one who cannot arrest the offender, shall rely for satisfaction ■wholly upon the discretion of the master. The shocking con *46 sequences which, as may easily be imagined, would result from such a course, show that the usage which has prevailed conforms to the necessities of a slave-holding community, and that if express legislative authority cannot be found for it, this is only because the usage has never been questioned.
Insolence is multiform and incapable of definition — so is official misconduct, ungentlemanly deportment, disrespect by a soldier, and every offence which consists of inconsistency between conduct and station. To' the Court which tries it must be left to require a specification of the conduct, and to judge of the inconsistency. The Court of Magistrate and Freeholders may sometimes pervert their powers to the abuse of the law : but many guards against abuse in the trial of slaves have been introduced by late Acts of the Legislature, which did not exist in 1740: this Court is by the Legislature thought fit to be entrusted with all cases affecting the life of a slave, and it is not less fit to determine whether certain language and deportment of a slave, charged to be insolent, require any, and if any, what punishment. It must be presumed that the discretion of the Court will be wisely exercised, according to the circumstances of every case: distinguishing, for instance, between a case where a white person has, by familiarity, encouraged insolence, and a case where a rebellious temper has broken forth against one whose conduct as well as station was entitled to respect and submission.
The motion is dismissed.
Richardson, J. Evans, J. Frost, J. and Withers, J. concurred.